Good morning, Your Honors, and may it please the Court, Joshua Forst, James Garner, and Stuart Cottle on behalf of Appellant Texas Brine. This appeal is about preventing absurd results, the absurdity of expanding federal court jurisdiction based upon the timing of the service of process, and the absurdity of allowing an arbitrator to pocket ill-gotten fees. As the Court is aware, there are two issues on appeal. The first involves the propriety of snap removal, and the second involves the scope of arbitral immunity. I'm going to address the arbitral immunity question first, but obviously if the Court has any questions regarding snap removal before I get there, I'm happy to answer them. The facts of this case are important, and quite frankly, for an arbitration, they are bad. Texas Brine has sued Mr. DiLeo, Mr. Minyard, and the AAA for damages that Texas Brine incurred in engaging in a four-year long arbitration. That arbitration resulted in numerous interim awards and orders, all of which were vacated by the state district court judge based on evident partiality. Judge Cleaver specifically found in vacating all of those awards and orders, quote, TPC was completely deprived of notice of substantial conflicts possessed by the arbitrators throughout the entire arbitration process, close quote, and that a, quote, reasonable person would have to conclude that an arbitrator was biased either against TPC or in favor of Oxy, close quote. And both of those are found in the record at page 941. In his opinion vacating the awards, Judge Cleaver commented that these transgressions were both intentional and continuous. The law should not immunize arbitrators for this kind of intentional and fraudulent misconduct. That is, the kind of misconduct that Judge Cleaver found was intentional and was the basis for vacating the arbitration awards. The Federal Arbitration Act itself provides for no arbitral immunity. Instead, arbitral immunity is a construct by the courts, and it is a result of a rather facile analogy to judicial immunity. But arbitrators and judges are different, and because of those differences, the same immunity that applies to judges does not have to apply to arbitrators in exactly the same way. In other words, the scope of the immunity afforded to arbitrators should reflect their differences with judges. As this Court recognized in E.C. Ernst and the Supreme Court recognized in Commonwealth Codings, arbitrators differ from judges in important respects. Unlike judges, arbitrators are obtained their authority by contract, solely by the party's contract. And a result of that, they owe only a personal duty to the parties to the arbitration. And didn't you consent to the arbitral immunity by proceeding in front of the AAA under their rules? I don't think so, Your Honor. Can I – I want to point you to one of them and help me – you can help me understand what it means. So I'm on page 989 of the record. This is, I guess, Rule 52d. Parties to an arbitration under these rules have deemed to have consented that neither the AAA nor any arbitrator shall be liable in any action for damages, injunctive relief, any act or omission, et cetera, et cetera. So why isn't that just the answer to the – Your Honor, for two reasons. One, even if that rule is enforceable, it does not apply to all the claims that Texas Bryant has asserted in this suit. But one of the claims that we've asserted is for equitable relief, it's for unjust enrichment. And the rule based upon the AAA's own language does not extend to equitable remedies like unjust enrichment. This is injunctive relief. That's right. It says very specifically damage is an injunctive relief. So your view would be that unjust enrichment, which would presumably involve the transfer of money, would not constitute money damage in action for damages? That's correct. That's exactly right, Your Honor. And the district court judge here, one of the reasons that she cited for rejecting the equitable claim was that she equated a claim for unjust enrichment and restitution with money damages. But as we've argued in our briefs, those two are not the same. And the Supreme Court in the Chauffeur's case, Hopkins' case out of the Eighth Circuit, established that where a party is seeking restitution and the money that has been recovered is restitutionary, that that is equitable, it's an equitable remedy, and it's not money damages. It's not a claim at law. So the first argument would be that even if 52d is enforceable, it doesn't extend to all of our claims in this case. Secondly, as we've argued, 52d is not enforceable under Louisiana law. Article 2004 of the Louisiana Civil Code expressly prohibits prospective contractual waivers of a party's intentional or gross fault that causes damages. And so to the extent that AAA or the arbitrators want to rely upon 52d, our argument is that it's not enforceable in this case, and therefore does not preclude even the damages that Texas Bryant is seeking in addition to the equitable relief that I mentioned a moment ago. And lastly, the rule should not be enforceable because the entry into the rules, the submission to those rules, assumes that the parties are all acting in good faith. Parties don't agree to enter into contracts and to abide by rules where all the parties aren't agreeing to do that in good faith. And the facts of this case demonstrate that the parties, at least some of the parties, didn't do that. And so certainly our argument is that AAA and the arbitrators should be stopped from relying upon 52d of the AAA's rules, because from the very outset of the arbitration, before the arbitrators were even seated, at least one of the arbitrators intentionally failed to disclose conflicts of interest that would have precluded him from sitting as an arbitrator, and Judge Kleeber relied upon that fact in vacating all of the awards issued by the arbitral panel. And that gets back to why the immunities that arbitrators are afforded do not have to be the same as the immunities that judges get, because unlike judges, the parties select the arbitrators. Here they actually interviewed them, and they pay the arbitrators. So the arbitrators have a financial incentive not to make full disclosures of their conflicts. And here, the way that the district court has applied the immunity, it doesn't recognize that difference. This Court, however, in Sparks held that absolute immunity should extend only to the extent necessary to protect a decisionmaker's independence. There is no reason, and no reason has been given by the district court or by the arbitrator, against his or her own intentional or fraudulent misconduct. There's no basis in law, and there's no basis in policy for that. Moreover, the differences between arbitration and the judicial process argue more strongly for a rule allowing for private parties to seek damages under these kinds of facts than in the judicial process, because arbitration does not have the same kinds of safeguards that exist in the judicial process. Arbitrators are not bound by precedent. They often do not issue full reasoned awards. Even when they do issue reasoned awards, there is no review at the appellate level for errors of fact in law, which the Court heard about earlier in another argument. And on top of that, there is no outside oversight regarding the arbitrators. There is no court of appeals, there is no judicial commission that reviews complaints of misconduct on the part of arbitrators. And consequently, there is absolutely no reason to extend arbitral immunity to intentional and fraudulent misconduct. In addition to that, even if the Court finds that arbitral immunity should be applied the same way that judicial immunity applies, it should not be applied any further. It shouldn't be applied more broadly than judicial immunity. And the district court here erred in two different respects in extending arbitral immunity further than judicial immunity. First, as I mentioned earlier, the district court dismissed Texas Brine's claims for equitable relief, and in particular its claim for unjust enrichment, which is a claim for restitution or disgorgement, essentially saying that the arbitrators intentionally misled Texas Brine. All of the awards that they issued, all of their orders they issued were vacated. The arbitration itself, the district court judge found, was tainted. And yet the arbitrators still want to retain their fees. There's absolutely no reason why an arbitrator or an arbitrational association that engages in this kind of tainted process should be allowed to keep the fees that they've been paid by the party that has been wronged by that intentional misconduct. And this court has repeatedly recognized that judicial and arbitral immunity is a form of quasi-judicial immunity, do not apply to equitable relief. In Sparks, this Court said, quote, We have never held that judges are immune from claims for equitable relief, and both we and the Supreme Court have intimated the contrary, close quote. That's at 604 F. 2nd, 980. Later in Holloway, the Court said similarly, quote, Judicial immunity does not extend to suits for equitable relief and declaratory relief under Section 1983, close quote. That's 765 F. 2nd at 525. Just this past week, another panel of this Court in the Calise case, which we apprised the Court of by supplemental letter brief, affirmed a district court's declaratory judgment in favor of a private party against a State court judge, proving once again that judicial immunity and therefore, by analogy, quasi-judicial arbitral immunity do not extend to claims for equitable relief, which is exactly what the claim for unjust enrichment is in this case. Counsel, you're two-thirds through your opening time. I wish you would address the exclusive remedy argument. The Corey case is a Fifth Circuit case that says the same thing. Why is this whole case not improper? Because Corey involved different facts, Your Honor. Corey involved a situation where the losing party in the arbitration failed to appeal the arbitral award and therefore, did not challenge it under Section 10 of the Federal Arbitration Act, and therefore, did not move to vacate it. Here, we did move to vacate all of the arbitral awards and orders, and we won. And what the Federal Arbitration Act says in Section 10 is it provides a basis for not enforcing an arbitral award. It goes solely to efforts that litigants may have to attack the award. Again, referring back to the Court's earlier oral argument, this is not a case about whether the award can be challenged or not. We've already fought and won that battle. So under Section 9 of the Federal Arbitration Act, a court must enforce or confirm an arbitral award unless it falls under one of the categories in either Section 10 or Section 11. Corey involved what was essentially a collateral attack on the award because the litigant there had never challenged the award. That's not the case here. And Section 10 of the Federal Arbitration Act, in fact, the other provisions as well, say absolutely nothing about arbitral immunity and say absolutely nothing about the extent to which a litigant who has successfully vacated the arbitration panel's awards may proceed in damages or for equitable relief against the panel or the arbitral association, for that matter. The other way in which the district court erred was extending the immunity to the panels as well as the arbitration association's administrative acts. And as we point out in our briefs, this Court, again, repeatedly has recognized that for quasi-judicial actors, the immunity does not extend to any situations in which they act in an administrative as opposed to a judicial or quasi-judicial capacity. Let me turn, unless there are any more questions on arbitral immunity, to snap removal, which is the other issue in the case. As we've argued in the brief, we asked the Court to reverse the district court's interpretation of Section 1441b-2 in allowing snap removal based upon the supposed plain meaning of that statute. The district court followed the reasoning in the Encompass case out of the Third Circuit. The opinion Gibbons out of the Second Circuit has also been cited, but they stand for the same proposition. The reasoning of all three of those opinions show the absurdity of following a strict, plain-meaning approach to Section 1441b-2. The diversity and removal statutes are based upon protecting out-of-State defendants from the potential bias of a State court. The Foreign Defendant Rule has recognized for decades that when an in-State defendant is named, the suit may not be removed, and that was recognized by the Supreme Court initially in the Pullman case in 1938. In 1948, Congress codified the Foreign Defendant Rule in what is now Section 1441b-2, and in addition added the language properly joined and served, which is the basis for the plain-meaning approach adopted by the other courts. But the majority of courts that have looked at that language in the legislative history of the amendment have found that the language was inserted not to defeat the Foreign Defendant Rule, but to deter a plaintiff from fraudulently joining or improperly joining an in-State defendant. Encompass and the facts in that case show how absurd it is to enforce the mean of the language strictly, and that's because in Encompass there was an out-of-State plaintiff who sued one in-State defendant. There was no concern, based upon the traditional concerns of diversity, for an out-of-State plaintiff or an out-of-State defendant being subjected to an in-State biased court. And there's no reason to be concerned about fraudulent joinder, because there was only one defendant, and that defendant was an in-State plaintiff. There could be no question that the plaintiff decided and wanted to pursue claims against that defendant. It was the only one. But following a strict meaning interpretation of 1441b-2, it's impossible to avoid that result. And as a result, we argue that the Court should reject that, because it promotes a form of gamesmanship that premises diversity and removal solely upon the timing of service. All right, Counsel. Good morning, Your Honors. I'm Tim Scanduro on behalf of the American Arbitration Association. I'll address the removal issue first. This case is an example, really across the board, of the knots we lawyers can tie ourselves into when we're confronted with a statute or a contract that we don't like. My opponent in brief said that the district court's interpretation of the removal statute was hyper-literal. Now, I don't know if there's a difference between hyper-literal and regular normal literal, but I do know this. The judge had no other principal way to interpret this law. You should have been here yesterday. We had an advocate that the other side only had a statute. And he had a bunch of cases, but the other side only had a statute. You don't have to work with that concept, but keep going. You think about this particular statute, though, Judge, and leaving aside all of the reasons why we can't look at legislative history, all the statutory canons that prohibited here, there is none. Courts have, in fact, found none. And so the old adage about legislative history relying on it being like looking across a crowded room and trying to pick out a friend, there's nobody in this room. There's neither friend nor foe in this room. All we have is the language of the statute. Now, that hasn't stopped some courts on both sides of this issue from presuming what Congress must have intended in the 1940s when they passed this statute. And we've seen it on both sides of the issue. The plaintiff embraces the minority number of courts who see the issue the plaintiff's way. But then along comes just this year Judge Sullivan from the Second Circuit in the Gibbons case, joining the Third and the Sixth Circuits. And the Second Circuit says, you know, one of the reasons Congress likes to pass statutes with bright-line rules like this is they work. They're efficient. They're predictable. They're easy to interpret. And we think that's what they did here. And the plaintiff says in its reply brief, well, that's just speculation. Well, you can't call it solemn congressional intent when you like the guesswork and rank speculation when you don't. This is what happens when parties who are completely unburdened by any actual legislative history get in the business of trying to figure out and put their own spin on what Congress meant. The bottom line is we can't wish a different statute into existence by imagining language that's not there. It's like when Lincoln said, how many, I think it was Lincoln, how many legs does a dog have if we call the tail a leg? And the answer is four, because calling the tail a leg doesn't make it a leg. And there's no leg of the type they're trying to create on this dog. They talk a lot on the removal question about exceptions that the statute couldn't have been intended to be applied this way in the Internet era. Let's not forget, they sent us a copy of this petition. When they sent us a copy of the petition, under Section 1446, our window opened immediately to remove the case. When we got the copy of that paper, it would close in 30 days. During that time period, Congress didn't tell us we had to wait any specific amount of time to remove the case, whether it's one week, two weeks, whenever it might be. It wasn't required by statute. It wasn't required by the law of this circuit in the Delgado case. Congress could have provided, and maybe it's an argument somebody can present to Congress that they should provide such a time period, but the statute's been on the books 70 years, and we're still waiting for that particular time period. So the AAA in this case availed itself of a right created by the law, procedure created by Congress, consistent with the consensus interpretation of the law of the district courts in this circuit, and removed the case.  You bet there was urgency. There was an ongoing arbitration in this case that the AAA had been trying for months to reconstitute a new arbitration panel. The AAA wanted a quick resolution of this legal issue. Now, as it turned out, maybe we weren't urgent enough, because before we were able to get the district court to rule on the motion, the plaintiff asked the AAA, as an institution, to recuse itself from handling the arbitration. AAA said it couldn't do it. The plaintiff went to the state court, sought an injunction, and the procedure just ground to a halt for almost a year. So I don't think we were urgent enough, maybe, in getting the relief that we got. Why am I pointing this out? Because the advantage of a bright-line rule in a statute like this is you don't get into this tit-for-tat, back-and-forth, factual push-and-pull about who intended what, who's gaming what, who's right and who's wrong. You just apply the statute, and you avoid what the Chung Court called the expense, delay, and uncertainty of trying to figure out what we should do in these cases. They cited some exceptions that they're asking, I guess, you, in the first instance, to apply. They didn't argue these exceptions to the district court. The Tedford case that they cite is no longer, it no longer applies in this circuit since the Hoyt decision this summer. And those cases were about extending deadlines when a party took an action to frustrate a time period created by Congress for the doing of an act. This is the opposite. There's no such time period. Once this case was removed to the federal district court and subject matter jurisdiction existed, which everyone agrees that it did, the rule that then applied from this court's Buhner case, 981 Fed 2nd 816, is that district court cannot remand that case on grounds that seem justifiable to the court, but aren't created by Congress in the governing statute. We also argued improper joinder. The district judge didn't reach that issue, didn't have to, but that's a good segue into the immunity argument. Now, I want to start first with the rules question you asked, Judge Oldham. This is actually my colleague's issue for today, so I'm not going to try to explain to you why something that they called a petition for damages. That's the title on the document, in which they're seeking to compel us to pay a sum of money to them isn't an action for damages, but it fits into this exception for prospective injunctive relief that they stretched to mean equitable relief that they stretched to mean money. I'm going to leave that to him, but I'm just teasing it for you on that question. Since it's the AAA's rules, can we talk about just the AAA's part of it? I mean, I gather that the broader arbitral immunity questions implicate other things that perhaps the AAA doesn't want to talk about, but what do we do with the argument that equitable relief is neither an action for damages or injunctive relief? I mean, it could have said actions in equity or law. It could have said, you know, or any other claim for relief, but it does seem to specify any action for damages or injunctive relief. Do you have to fall back on some broader — Sure. My first response to that would be the Supreme Court has recently reconfirmed. That would be a tight reading of that particular rule, but the Supreme Court has instructed that when you enforce those rules, and this is in EPIC systems, but certainly not only EPIC systems, that you have to rigorously enforce the rules that the arbitration sponsor. The policies underlying the FAA and the Supreme Court's decision animate your interpretation of that rule. My argument, simply, and my colleague is going to tackle that specific question, but damages are damages. Now, you can call it equitable relief, but Justice Scalia has said when you're seeking somebody to pay a sum of money, I don't care what you label it, and the immunity cases we've given to the court consistently say, a number of them say, you can't label your way around immunity. When you have good lawyers like this, if you labeled your way around immunity or around a rule, and I feel quite certain the intention was damages or injunctive relief was covering the spectrum of what the AAA has ever been sued for in its almost 100 years of existence, and I certainly don't want to say that they should have thrown in what a lawyer's release would look like with 50 different descriptions of what was being released, attorney fees and all the rest of it. Perhaps that might be something to be considered, but given the interpretational age that the Supreme Court has provided on these specific rules, particularly the rigorous enforcement, I just — I think it would be a travesty to interpret it that way, given what the purpose of the rule was. What Epic says is that we're supposed to interpret all of this in a way that is consistent with the arbitration or consistent with the agreements that the parties reach with respect to arbitration. But these are obviously the AAA's rules written — I mean, this is not a labeling game that the plaintiffs are playing. I mean, I assume that the AAA wrote Rule 52d to protect itself and say, hey, if you guys want to invoke the AAA's arbitration provisions, just FYI, by doing so, you're consenting to the application of this rule that the AAA wrote. It's sort of like the sovereign writing its own rules of sovereign immunity, but it didn't — it wasn't any more specific than the text here, right? Right. I feel confident that damages and injunctive relief at the time it was written was intended to cover the landscape because that was what they were familiar with. And I would again — I would again call your attention to the creative pleading ways that start to erode some of the principles of that issue. But you make a good point. And I would point out that the rules aren't just interpretational guides, as the Supreme Court has said and we've given you the case. They're incorporated into the party's contract and they have the force of a forum selection clause. Let me turn to — let me turn to arbitral immunity generally, because we have made several arguments. Arbitral immunity generally, Justice Scalia, again in Burns v. Reed, he takes it back at least to the 1800s. So the doctrine actually predates the implementation, the adoption of the Federal Arbitration Act. The purposes and goals of the doctrine have been stated over and over and over by the courts. I'm not going to repeat them here. I wrote down, counsel argued, that there was no basis in law for arbitral immunity and my argument would be that not only has that ship sailed, but it's been around the globe I don't know how many times. There's a number of cases that have recognized it. And in arbitral immunity cases in particular, the courts have noted, unlike judicial immunity, that the policies of the FAA — speed, efficiency, inexpensive-ness — animate the immunity doctrine as well and make it different in that respect. So our court has never recognized it, right? At least in a published opinion. We've done it once maybe in an unpublished opinion, the concept of arbitral immunity? You've done it in the Hudson case. You've done it in the Hawkins case. You've done it in the Jason case. Whether all of those are unpublished or not, I don't — those could be Federal Appendix reported cases, but I don't — Where would the judicial power come from to immunize a private entity from a lawsuit? So it stems from judicial immunity. It actually predates, you know, the formation of the Republic. It goes back — So we can debate for much longer than three minutes whether Article III of the Constitution allows Federal courts to immunize Federal courts or perhaps even State courts. But the AAA isn't — with all respect, it's not a — I don't mean it as a criticism. It's just — but it's not the same thing as an Article III court. That's the whole purpose of arbitration and the Federal Arbitration Act, is to encourage this private ordering. So how would a Federal court — I don't even understand where the — what the argument would be as to where the power would come from for a Federal court to say a private entity is immune. So when the Supreme Court recognized it formally and then it was extended by these other circuit courts to judges, the concept was that as a matter of Federal common law, it was so important to have freedom of decision-making, freedom from harassment, performing these roles that, yes, they're a private entity, but these are judicial functions. These are decision-making functions. In this particular case, the AAA's large, complex commercial case docket, the $10 million and up cases, they've got a big roster of these. And the FAA by policy sets up the organizations like the AAA and encourages them to conduct these arbitrations. And again, very recently, Henry Schein, very recently Epic Systems, the court says be wary of devices that prevent the accomplishment of the goals of the Federal Arbitration Act. But the FAA doesn't say anything about this. Like, it's not in the text of the FAA. It's not in the text of the FAA, but the FAA, again, according to those recent Supreme Court cases, the text of the FAA was designed in a very specific way. It provided a remedy. Counsel said there's no remedy. There is a remedy provided by the FAA, and the FAA in the cases that Judge Southwick mentioned say you cannot rewrite the FAA. I wanted to point out one case to you, Your Honor, on that subject. I still have a minute, but I thought you might ask that. And there's a case called, it's from the Seventh Circuit. It's the Greyhound case, 701 Fed Second 1181. And this is a case in which an argument was made that the ERISA statute operated in such a way as to be a congressional expression of intent, that immunity did not apply to the particular individual exercising the decision-making function in that case. And what the court, in essence, said was that given the doctrine of immunity, quasi-judicial immunity in that particular case, was so powerful that Congress would not have impliedly authorized a suit in the face of immunity. It would have to be absolutely expressed. The decision really struck me when I read it, because the immunity goes back so far, predating really the enactment of the Constitution, it goes back to medieval times, according to the Forrester case, that it's acquired so much importance because of the critical principles that it protects, Your Honor, that even if Congress comes in, as it has, by the way, under 1983, you can file an action for declaratory relief against a judge. Congress has to specifically say it, but the doctrine is so strong that unless they do, it's not a rule that if immunity isn't created by the statute, it doesn't exist, if that answers your question. I'm out of time. I'm sorry. All right, counsel. Thank you. We'll hear what your colleague has to say, unless you've covered it all. Lawyers have to hear themselves talk, Your Honor. May it please the Court, Thomas Flanagan, I'd like to begin with the point about this so-called equitable exception to arbitral immunity, and the exception doesn't exist. This arises from a misreading of the Pulliam case in 1984, and the fallacy is essentially that because Pulliam recognized one type of equitable relief, prospective injunctive relief, and because restitution can sometimes be equitable relief, well, therefore, all manners of equitable arbitral immunity, and I think the most important point I can make to you is not a single court has ever held that under Pulliam or any other theory, you can have a monetary award against an otherwise immune judge or arbitrator. It simply doesn't exist. The Pulliam case specifically dealt with unjust enrichment, recovery of fees paid? They have, Your Honor. I believe it's the Olson case from the Eighth Circuit that we cited in our brief. I'll only address very briefly the practical effects of such an exception. It has all of the bad effects of litigation on arbitrators, all of the looking over the shoulder, all of the worry, all of the disruption and additional expense, and really functions only as a sort of consequential damages waiver in an agreement. One can imagine that as we lawyers go to seminars, the instruction will be every time you file a motion of vacate under Section 10, pair it with a suit for equitable relief, get your money back from the arbitrators. Again, no court — That assumes, of course, that the AAA doesn't change the way that the rule is written. I mean, obviously, they can change — they can write this however they wanted to, so the practical impacts are not particularly obvious. Well, let me get to that, too, because that's the question. What is equitable relief? Both sides have cited the ERISA jurisprudence, and in particular, Justice Scalia's opinion in Great Southwest v. Knudsen, and I think the point that the Justice made there was when you're dealing with money, that is the classic form of legal relief, and it's not enough to say that one is calling their theory restitution or, in this case, unjust enrichment. What the opinion teaches us is that restitution in equity, what was typically available in possession, if the funds have been dissipated, you're a general unsecured creditor and you have a remedy at law. Typically this requires a theory of constructive trust or equitable lien, which we reject in the civilian system. We have cited this Court recognizing that as well. And again, I would just point to this notion that there's no case that awards money under any theory. And one imagines when we have a vacular, the argument could be made every time. So I certainly understand the argument about why this would cover the plaintiff's or the TBC's claims. But suppose with me just hypothetically that not all of TBC's claims are barred by Rule 52d and we have to resort to this general notion of what is, I guess, Federal common law. Since Erie, we don't use Federal common law to preempt State tort claims. So can you help me understand where the power would come from to create the rule? I can certainly try, Your Honor. In cases like Jason and Hawkins, this Court has drawn inspiration from the FAA. And they say in light of the Federal policies reflected in the FAA, arbitral immunity is essential. And the Court used that word in Jason. Hawkins cites Corey, which is a case that, again, says Federal policy as manifested in the Arbitration Act and case law. Again, immunity. Judge Vance cited Wazzle out of the Ninth Circuit, saying arbitral immunity is essential. And so this is an aspect of the FAA itself. It predates the FAA. But courts are drawing inspiration from that. The other principle, Your Honor, would be the exclusivity of the FAA's remedies. And Corey, which this Court has cited a few times, recognizes that Section 10 outlines the remedies for a party dissatisfied with a particular result. And again, the argument is under the FAA that essentially by expressing these particular remedies, there is an exclusion of other remedies. And then I would just go back to the AAA rules. And with leave of court, we could submit a letter brief on this. I believe the AAA rules also prohibit the arbitrators from being a party in a case. They cannot be sued. They cannot even be made witnesses. And I would suggest that, as Epic Systems reminds us, the FAA essentially federalizes those rules. And I think they have to be enforced then as a matter of Federal law. Thank you, judges. Appellees criticize Texas Brine for not wanting to follow the strict terms of the removal statutes in 1441b-2, but they have no problems ignoring the strict terms of their own rules as well as the FAA. The FAA says absolutely nothing about arbitral immunity.  And that also does not preclude these kinds of suits that Texas Brine has sought. Contrary to counsel's argument, it's not necessarily in every case that you have vacature that will result in a subsequent lawsuit. But even if it did with respect to the return of fees, what is the harm or the inequity in that when you have arbitrators who intentionally fail to honor their own obligations? And that goes directly to the rule that the AAA wrote. As has already been discussed, it expressly does not cover anything other than damages and injunctive relief. Now, could the AAA do that? It could do that. But the Court's opinions draw distinctions among different types of equitable remedies, and the AAA did not include every equitable remedy in its own rules. And quite frankly, all these parties should be stopped from even arguing that they're not required to make restitution. In addition to the AAA's rules, it also had the arbitrators sign and provide it to all of the parties the terms of payment. And the terms of payment at page 1173 of the record specifically says that where the arbitrators fail to make timely and full disclosures, they have committed a, quote, unquote, serious transgression. And when they commit a serious transgression like that, they may forfeit their fees. So if that's true, why does Texas Brine or any other litigant who participates in arbitration have to wait around to find out whether or not the AAA is going to enforce its own rules, whether it chooses to get the money back that Texas Brine and others have improperly had to pay because of intentional misconduct? Counsel also argued that, well, there are no cases like this. There are no other cases where an equitable remedy has been used to get fees back. And specifically made reference to judicial immunity cases. Well, that just proves the point. The point that I made initially, which is arbitrators and judges are different. There's no equitable injunctive, I'm sorry, unjust enrichment claim against a judge because we don't select and pay our judges. We do select and pay our arbitrators. And when they intentionally lie to us about their conflicts and that results in a wasted arbitration and a vacation of the arbitration panel's awards, then the parties are entitled to get their money back. This is a claim solely for restitution in the equitable sense. Money has been paid to the arbitrators in the AAA. They are not entitled to that money, and it should be returned. And that's exactly the analysis of the Hopkins case out of the Eighth Circuit found relying upon the Supreme Court's opinion in Chauffeurs, Teamsters and Helpers as well as the Great West Life Insurance v. Knutson case. In addition to that, as we've argued, Article 2298 of Louisiana Civil Code views this kind of unjust enrichment remedy as an equitable remedy. It was codified following the Supreme Court of Louisiana's decision in the Minyard case, and the comments to that rule specifically recognized, as the Minyard case did, that this is an equitable remedy and, therefore, Texas brines should be entitled to pursue it because it is outside of any immunity that the arbitrators can claim because even judges do not have this kind of judicial immunity. Just as was noted in the questioning earlier, there is nothing in the FAA that creates this kind of immunity. So there is no statutory prohibition against this Court limiting any kind of immunity that may apply to arbitrators. We're not saying, for the purposes of this appeal, that there is no immunity. We don't need to argue that here. But even if there is an immunity, it should not extend to intentional and wrongful acts. Let me switch briefly to the snap removal issue. There is a different kind of gamesmanship involved with snap removal than with fraudulent joinder, because with fraudulent joinder, there's an opportunity for the district court to correct the error. If a plaintiff has improperly or fraudulently joined a defendant, an in-State defendant, the out-of-State defendant may still remove the case and can survive a motion to remand by proving fraudulent joinder. But if we take this strict literal interpretation of 1441b-2, it's purely a race. It's purely a race. It's a question of whether or not I can effect service before the defendant who learns about the lawsuit can remove it. And under their reading of the statute, the district court judge can't do anything about that. It deprives the plaintiff of the plaintiff's choice of the forum, and it unduly expands this Court's jurisdiction. And therefore, we ask the Court to reverse the district court's holdings. Thank you, counsel. Well argued on each side. Case and advisement on all the cases of this week. That is it for us, and we are adjourned.